Viet Nguyen, Mr. Shepard. May it please the court, counsel, I am Adam Shepard and I represent Viet Nguyen. The matter comes before this court on our appeal requesting a reduction in the defendant's sentence upon re-sentencing or a remand for further re-sentencing. Our principal arguments are twofold, one that insufficient weight was accorded to the defendant's post-initial sentencing rehabilitative conduct and second that the sentence is substantively unreasonable based on an unwarranted sentencing disparity with the co-defendant and with other similarly situated defendants whose cases we cite in the reply brief and whose cases were brought to the attention of the district court at the initial sentencing. Why was that first raised in your reply brief? The disparity was, yes, in the reply brief, however, we raised substantive unreasonableness in our opening brief, the government countered as to why it was not substantively unreasonable, we then cited to the disparity argument as to why it was. So it strikes me as an entirely new argument, save for reply, but all right, I understand. Thank you. The type of post-sentencing rehabilitative conduct in this particular case is different than some of the other cases. We believe this case, the type of conduct is closer to the conduct in Pepper, which the court recognized as grounds for possible relief and resentencing. This isn't a case, unlike the recent case of Rod Bogoyevich, which was recently decided last week. This isn't a case where we just presented letters from fellow prisoners, although we did do that. And we didn't just talk about the educational and vocational programs that the defendant did. Although we did do that, we cited nine of them to the district court upon resentencing. In this case, the defendant took it, well, there was some dispute in the record whether he was asked to become a, tantamount to an informant within the federal correctional institution in Ohio and then at the MCC, or whether he volunteered. And that type of post-sentencing conduct, I think, distinguishes this case from other cases where relief has not been granted. He had to spend 21 days in solitary confinement because based on the seizures that his information led to, his name was included in a report in that other case, which led to the government to take some action against the other inmates who he provided information for. He received a letter from a fugitive, which on his own accord, he turned over to prison officials. And his information was borne out by FBI reports, which we presented to the district court at resentency. They, one of the reports referenced him as currently the only confidential informant at the MCC. He provided information which led to seizures of synthetic K2 marijuana, alcohol, and this information was presented to the district court at resentency. This is all post-conviction. What's that got to do with what he did in the first place? It doesn't change the seriousness of the offense. What it does change is his prospect for rehabilitation. His prospect for second guessing this initial sentence again, and again, and again. And you come back to the Court of Appeals as Boglovich did, and as you're doing well. The reason we think it's relevant, as we cite the language in Pepper, which says that the post-sentencing conduct is highly relevant to the potential for rehabilitation. In Boglovich, they attacked the sentence based on- So if it is, then what would you suggest the sentence be? We would suggest a sentence commensurate with the variance that was issued in the underlying case. In this case, the sentence was 96 months. The co-defendants guidelines were the same. They started off at the bottom as 97 months. The government made a 5K1 motion, which would have brought the guidelines down to 57 months. She received one day time considered served. We're not suggesting that Nguyen's sentence should be anywhere near that. But even the co-defendant prior to the 3553 application, the sentence was looking at 57 months. Now, somewhere between there and the 96 month sentence that was imposed, we think is sufficient, but not greater than necessary. I don't really understand your argument that in prison, he has been exhibiting signs of rehabilitation. Yes, Your Honor. I don't see how you could predict, how you could... How you could assume that that had anything to do with how he would behave after being released from prison. For that proposition- He had nothing else to do in prison. Might as well, you know, be a good boy, try to make a good impression. I don't know why that should have any effect on the sentence. He went beyond being just a model prisoner. Bogoyevich was a model prisoner, which I think the district court in that case referenced, that his decent behavior kind of expected of a model prisoner. But by becoming an informant, and we cited to the information in our opening brief, how that does have bearing on rehabilitative potential above and beyond regular taking classes and tutoring other prisoners. Although Nguyen was not the recipient of a 5K1 departure at any point, it's in the same vein that cooperators like him have a higher likelihood of rehabilitative potential for those stats. On that issue, could you address the telephone calls that were of considerable interest to the district court? Yes. On this notion of remorse, acceptance, and so on. We believe, and I see we're on my rebuttal time, but I believe that they're best characterized as posturing. The district court used-  And she did evaluate it. And we're not quarreling with the fact that she considered it. Our position is that the positive conduct, while he was a prisoner, far outweighed that. And it didn't negate his rehabilitation. Again, second guessing the district judge's decision as to the sentence. You're asking us to make it, well, if we were sentencing, we would have certainly given him time for that. Right? Not just that. Not just whether to revisit the balance. You said you're trying to game the system. That's what she said about his telephone conversation. Our position is that what somebody says to their family member- And we should have said, no, you're wrong. He wasn't trying to game the system. That's correct. I think that what the family members- So you're asking us to then take the judge's discretion and cut it apart, piecemeal it apart, and said she had no discretion in making that determination. We believe she had the discretion. We believe it was an abuse of discretion in this case. What was the period over which he was behaving himself? How long was that? It was from his sentencing, it was over six months before he came back before the district judge, pursuant to a joint remand. If there's no further questions, I would like to reserve rebuttal and yield to the government. Okay. Thank you, Mr. Sheffield. Ms. Stern? May it please the court, good morning. I'm Jacqueline Stern on behalf of the United States. The sentence in this case should be affirmed. The district court carefully considered and addressed the statutory sentencing factors. The district court also carefully considered and addressed the evidence and the arguments made by the defendant in mitigation. The court imposed a sentence of 96 months, which is within the guidelines range. The guidelines were calculated properly. There were no procedural errors, and the defendant is not arguing that there were procedural errors. There were no unwarranted sentencing disparities, and the district court did not abuse its discretion. Sentence is substantively reasonable and should be affirmed. In terms of the period of time that he was in jail, it was ten months. The initial sentencing was in August 2015, and the district court imposed a sentence of 96 months at that time. The case was remanded for resentencing based on issues relating solely to supervised release, and that was on an agreed motion. The resentencing was in June 2016, and the district court again imposed a sentence of 96 months. The court thought she got it right the first time. The defendant was in jail for ten months after the first sentencing, and the defendant's conduct while he was in jail was the primary focus of the resentencing in 2016. The defendant presented evidence of good conduct, the government presented evidence of bad conduct, and after considering all of the evidence, the judge came out exactly where she was before. On appeal, the defendant is arguing the district court gave too much weight to the bad conduct and too little weight to the good conduct. But that's exactly what the court should be doing is determining the appropriate weight. It was not an abuse of discretion. In the recent case concerning Rod Bogoyevich, the court stated a district court has discretion in terms of the issue of post-conviction rehabilitation, and even though a court could rule in favor of a defendant, the court is not compelled to do so, it's a matter within the discretionary authority of the district court. And in this case, the judge simply was not persuaded by the defendant's arguments concerning rehabilitation. The court specifically pointed to the need for deterrence and the very serious nature of the offense. The judge said that she looked at the factors of deterrence as a major factor that the court had to rely on to make sure that the defendant understood and didn't come back and do this on a level to anyone else, and that there was a need to protect the public. In terms of the issue of disparity, unwarranted disparity, the sentence was within the guidelines, and again in the recent Bogoyevich case, the court said that the sentencing guidelines themselves are an anti-disparity formula, that if the court imposes a sentence within the guideline range, it means the court has given adequate consideration to the relation between the defendant's sentence and sentences imposed on other defendants. That doesn't really follow. Well, certainly in this case, judge... It would depend on the reasons that the judge gave. The fact that it's within the guidelines doesn't mean it's a valid sentence. Judge, in this case, the judge did look at all of the factors considered... Of course they can look at everything. The question is, is it, you know, analytically sound? The judgment they make on the basis of the facts. And in this case, judge, her reasoning was analytically sound. Given the evidence that she had concerning the very severe nature of the fraud, the extensive nature of the fraud, and then the statements that the defendant made while he was incarcerated on the MCC tapes, where he lied about his own conduct to two people. He said he was not responsible for the credit card fraud, although he had pled guilty to that. He said that he was in jail because of other people's conduct, which was untrue. He said that if the court ordered him not to have a business, he'd simply end-run that,  He said that everything that he did while he was in jail, the religious things, the university things, and his cooperation, he did all of that because he wanted to get out of jail. And he said that he believed that the judge had given him essentially a wink and a nod, imposed 96 months to show that she was tough to reporters, and that, in fact, she was going to possibly let him out immediately, but give him a much lower sentence. In addition to that, Judge, throughout the time period while he was on bond, he continued to use other people's names, and he continued to do that while he was in jail. It was a very, very serious crime, $2.8 million and tax fraud. So she did do a reasonable analysis. It was substantively reasonable. There were not unreasonable disparities, unwarranted disparities. In terms of the co-defendant, he made millions. The co-defendant made nothing. The co-defendant cooperated. He did not. The co-defendant was the employee. He was the leader, organizer, and owned the company. Unless you have further questions, I will ask you to affirm the judgment. Okay, thank you, Mr. Shepard. Do you have anything further? I have two brief rebuttal points. One is to that conversation about the overseas. If the court looks at the initial sentencing hearing, I think it was page 103 of the initial sentencing hearing, where the court initially admonished about what type of employment would be barred, the court didn't bar any employment involving a company. She barred an employment with a company where the defendant would have access to personal information or taking out lines of credit. So the fact that a defendant says on the call, I'd like to start a company overseas if I'm not permitted to there, it doesn't mean he's trying to skirt that judge's ruling. That was a narrow ruling about what type of employment would be permitted. Mr. Stern gave quite a list of, and it's of course in the briefs, of things he said during the period in which you say he was showing the rehabilitation that cut very much the other way. Our position is actions speak louder than words. He didn't start cooperating late. He actually did cooperate in the underlying case. He proffered, I believe, multiple occasions, and he pled it in a timely manner pursuant to a plea declaration. Everything he did in court- It's not obvious that current action overcomes the current words. You said that anyone who demonstrated the rehabilitation aspects that he did would be a good candidate for permanent rehabilitation when he was released from prison. Do you have some basis for that belief? Yes, Your Honor, and we cite in our opening brief that those who cooperate, even if they're not the recipients of a formal 5K1 motion, have a higher propensity for rehabilitation. We also cite- And that's based on what? That is based on the other courts conducting studies, and those cases are set out in our opening brief. When you say other courts conducting studies, what do you mean? Apparently reviewing recidivism rates among offenders who received either a 5K1 departure or were otherwise known to cooperate. We also cite to the studies- The courts did studies? How did they reference the studies? In our brief, well, we actually do reference studies of the commission, of the Sentencing Commission in our opening brief, but the case of the courts- I'm talking about the courts. I'm referencing to the cases we cited in our brief. I believe there was also an analysis of the statistics of those who received 5K1 relief. But does any of this evidence discuss people who say the sorts of things that he said that the government relies on as evidence of unlikelihood of rehabilitation? That, I don't know. Our position is that those words are not a reliable indicator. Why not? Because everything he did in his actual life, when he wasn't posturing to- What do you mean his actual life? When he came, for instance, starting off proffering in the underlying case, entering a timely plea, becoming an informant, accepting responsibility, it all belies all of the conduct, those phone calls to family or friends. And most defendants don't talk on MCC phones where they can be recorded, and they know they're recorded, right? Correct. So our position is that was mere words. So you're unlikely to get contrary views. That's correct. We did cite to an Illinois appellate court case, of course, nonbinding, that talks about the difference of an affirmative lack of remorse versus someone who's posturing or insisting on innocence. And in the Illinois case that we cited, they drew a distinction. In our position, he didn't demonstrate an affirmative lack of remorse in this case. Okay. Well, thank you very much, Mr. Stern and Mr. Shepard.